**FILED**
6/18/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint                                    AUSA Anne Yonover (312) 886-2038

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

VERNADO PARKER, and
RAMON DOWNS

CASE NUMBER: 26CR309

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### COUNT ONE

On or about April 7, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant VERNADO PARKER violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Did knowingly and intentionally distribute a controlled substance, namely, 40 grams or more of mixture and substance containing a detectable amount of fentanyl, (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance |

### COUNT TWO

On or about April 7, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant RAMON DOWNS violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_Michael Ganley_

MICHAEL GANLEY
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: June 18, 2026 4:00pm

_Albert Berry III_
*Judge's signature*

City and state: Chicago, Illinois

ALBERT BERRY III, U.S. MAGISTRATE JUDGE
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, MICHAEL GANLEY, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since approximately January 2020. My current responsibilities include the investigation of violent crimes and narcotics trafficking offenses.

2.      This affidavit is submitted in support of a criminal complaint alleging that VERNADO PARKER ("PARKER") and RAMON DOWNS ("DOWNS") have violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PARKER with distribution of a controlled substance, namely, 40 grams or more of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1), and DOWNS with possession with intent to distribute a controlled substance, namely, 40 grams or more of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1), I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, my training and experience, my review of audio-video recordings, my review of judicially authorized

intercepted wire communications, and information provided to me by other law enforcement agents.

## I.      FACTS SUPPORTING PROBABLE CAUSE

### A.      Summary

1.      In or around January 2023, law enforcement began investigating PARKER for distributing fentanyl, heroin, and cocaine in the Hazel Crest and Chicago areas. In furtherance of PARKER's drug trafficking activity, PARKER has used a phone number answering to (312) ***-7447, subscribed to Individual K at 18600 Village West Drive, Apartment 109, Hazel Crest, Illinois 60429 ("Target Phone 1") to engage in narcotics trafficking.

2.      On or about March 22, 2024, Acting Chief Judge Manish S. Shah authorized law enforcement to intercept wire communications for a period of 30 days over Target Phone 1.

3.      In summary, while law enforcement intercepted wire communications over Target Phone 1, they overheard multiple conversations between PARKER and an individual who was later identified as DOWNS. During these conversations, they discussed DOWNS purchasing narcotics from PARKER. On or about April 7, 2024, DOWNS met with PARKER to purchase fentanyl. Shortly after this meeting, law enforcement stopped DOWNS' vehicle and arrested him after DOWNS fled from law enforcement on foot down a grassy embankment. They later recovered a bag containing approximately 109.1 grams of fentanyl from the grassy embankment near where DOWNS had been arrested.

2

### B. Facts Leading to DOWNS' Arrest on April 7, 2024

4. On or about March 25, 2024, at approximately 7:25 p.m., PARKER, using Target Phone 1, received an intercepted phone call from 612-***-8815 (Subject Phone 3), believed to be used by DOWNS.[1] During this call, PARKER asked DOWNS, "What up, neph?" to which DOWNS replied, "What's goin on, unc?"[2] As their conversation continued, DOWNS later stated, "Same old shit man, you know I'm just tryin, I'm just getting the rest of that ground [money], man." PARKER responded, "Okay." DOWNS then said, "I got you. I'm coming." PARKER then stated, "Okay, yea I just, aight. I'm just, I'm just checkin on you." DOWNS said, "No, I'm good. You know,

---

[1] Law enforcement has identified PARKER as the user of Target Phone 1 based on the following: (1) on numerous occasions over recorded phone calls, the user of Target Phone 1 arranged to meet with associates. Law enforcement observed a male meet with these associates at the arranged meeting locations. Law enforcement compared this male with a driver's license photograph of PARKER obtained from the Illinois Secretary of State and determined it was the same person; and (2) according to the service provider, Target Phone 1 is subscribed to Individual K at an address of 18600 Village West Drive, Apt. 109, Hazel Crest, Illinois. PARKER's driver's license, maintained by the Illinois Secretary of State, lists that same address. Law enforcement identified DOWNS as the user of Subject Phone 3 based on recorded phone calls, where PARKER agreed to meet with the user of Subject Phone 3. Law enforcement observed a male meet with PARKER. Law enforcement compared this male to a driver's license photograph of DOWNS obtained from the Illinois Secretary of State and determined it was the same person.

[2] Some of the intercepted and recorded conversations have been summarized in this Affidavit. The language that is quoted from these conversations throughout this Affidavit is based upon a preliminary review of the conversations, and not on final transcripts of the intercepted/recorded conversations. The times listed for the recorded and intercepted conversations are approximate. The summaries do not include all statements or topics covered during the course of the conversations. At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the intercepted and recorded conversations. My interpretations are based on the contents and context of the recorded/intercepted conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

I'm all . . . everything is A-1 okay. We good (laughter) for real. Okay, I'll be down there probably next week some time."

5.     Based on my training, experience, and my knowledge of this investigation, I believe that during the above conversation, DOWNS explained to PARKER that DOWNS was working on obtaining the money needed to purchase narcotics from PARKER. Additionally, I believe that DOWNS told PARKER that DOWNS was going to be in the Chicagoland area the following week and that DOWNS would see PARKER then.

6.     On or about April 2, 2024, at approximately 12:14 p.m., PARKER, using Target Phone 1, placed an intercepted phone call to DOWNS, who was using Subject Phone 3. During this call, PARKER and DOWNS discussed DOWNS' plans to travel to the Chicagoland area during the upcoming weekend on "Sunday" [April 7, 2024], to pick up narcotics from PARKER. More specifically, during their call, the following conversation occurred:

PARKER:    How you looking?

DOWNS:     I'll be down there this weekend . . . I'll be down there Sunday.

PARKER:    Yeah but I wan, I may want you to look at something else too. Take with you. Ok?

DOWNS:     Alright, I'ma need, need two [unknown amount of narcotics].

PARKER:    I know that already . . .

DOWNS:     . . . alright.

PARKER:    . . . but I may look at something else for you too.

> DOWNS: Whatever you want, whatever you want to do. Whatever you want to give me I'm gonna do it.
>
> PARKER: Alright.
>
> DOWNS: Alright.

7. Based on my training, experience, and knowledge of the investigation, I believe that during the above conversation, DOWNS told PARKER that DOWNS planned to make a trip to the Chicagoland area on Sunday, April 7, 2024, and that DOWNS wanted to purchase narcotics from PARKER. DOWNS confirmed his narcotics order by telling PARKER, "I'ma need two," to which PARKER indicated PARKER knew that DOWNS wanted "two" ("I know that already"). PARKER then told DOWNS that PARKER had additional narcotics to sell to DOWNS. In response, DOWNS confirmed that he would sell whatever narcotics PARKER provided to him.

8. On or about April 5, 2024, at approximately 5:05 p.m., PARKER, using Target Phone 1, received an intercepted phone call from DOWNS, who was using Subject Phone 3. During their call, the following conversation occurred:

> PARKER: What up player?
>
> DOWNS: Same old shit (UI). Shit, I'll be there on Sunday, man.
>
> PARKER: Okay. We good.
>
> DOWNS: Can you, make it a little bit stronger.
>
> PARKER: Huh?
>
> DOWNS: Stronger.
>
> PARKER: Yeah. We good.
>
> DOWNS: Okay. Alright.

9. Based on my training, experience, and knowledge of the investigation, I believe that during the above conversation, DOWNS confirmed he would meet with PARKER in Chicagoland area on Sunday, April 7, 2024, to purchase narcotics from PARKER. DOWNS also asked PARKER to make the narcotics he sold to DOWNS stronger.

10. On or about April 7, 2024, law enforcement utilizing GPS location information on Subject Phone 3, observed that at approximately 12:28 p.m., a black Chevrolet Impala bearing Minnesota license plate LFY704 (the "Impala") was traveling South on I-90 at Central Avenue in Chicago. Based on law enforcement surveillance, Individual A was driving the Impala and DOWNS was in the front passenger seat.

11. Surveillance units observed the Impala travel to 2150 South Canalport Avenue in Chicago (the "Canalport Address"), and arrive at approximately 1:05 p.m. At that same time, PARKER, using Target Phone 1, received an intercepted phone call from DOWNS, who was using Subject Phone 3. During the call, DOWNS said, "I'm here," and PARKER responded, "Alright." The Impala then left the Canalport Address and traveled to the intersection of Canal Street and Roosevelt Road at approximately 1:15 p.m. At approximately 1:30 p.m., the Impala then returned to the Canalport Address.

12. At approximately 1:41 p.m., surveillance units observed PARKER arrive at the Canalport Address in a white Mini Cooper bearing Illinois license plate N578929 (the "Mini Cooper"). Law enforcement identified PARKER by comparing the

appearance of the individual driving the Mini Cooper to PARKER's driver's license photo maintained by the Illinois Secretary of State. Law enforcement observed DOWNS enter PARKER's vehicle. Based on law enforcement surveillance, PARKER and DOWNS then left together in the Mini Cooper and arrived at 1357 Blue Island Avenue at approximately 1:50 p.m.

13.     Based on law enforcement surveillance, at approximately 2:00 p.m., PARKER and DOWNS returned to the Canalport Address in the Mini Cooper. At approximately 2:03 p.m., surveillance units observed PARKER exit the Mini Cooper with a bag and enter the Impala. Law enforcement also observed DOWNS exit the Mini Copper and get into the Impala.

14.     At approximately 2:05 p.m., law enforcement observed PARKER exit the Impala and drive away in the Mini Cooper. Based on law enforcement surveillance, Individual A and DOWNS departed the area in the Impala, traveled northeast on South Canalport Avenue and then westbound on I-90/94.

15.     At approximately 3:12 p.m., Illinois State Police conducted a traffic stop on the Impala on I-90 West. Illinois State Police stopped the Impala on an exit ramp. Individual A curbed the Impala along the shoulder of the exit ramp. Law enforcement maintained uninterrupted surveillance on DOWNS from the point he met with PARKER until the traffic stop was conducted at approximately 3:12 p.m.

16.     During the traffic stop, both Individual A and DOWNS exited the Impala at law enforcement's request. After exiting the Impala, DOWNS fled from law enforcement on foot. DOWNS ran down the grassy embankment located next to the

shoulder of the exit ramp. Law enforcement eventually caught and detained DOWNS. DOWNS was detained approximately 25 yards from where the traffic stop occurred. Law enforcement searched DOWNS' person for contraband with negative results. DOWNS was placed in a squad car and EMS was ordered at DOWNS' request. DOWNS was then transported to a nearby hospital for treatment.

17. Law enforcement towed the Impala to a nearby Illinois Tollway facility for further investigation and all law enforcement personnel left the scene of the traffic stop and relocated to the Illinois Tollway facility. At the Illinois Tollway facility, a law enforcement canine alerted to the odor of contraband on the trunk and front passenger side door of the Impala. The Impala was then searched with negative results for contraband. Law enforcement also searched Individual A's person for contraband with negative results.

18. At approximately 6:00 p.m., law enforcement returned to the location of the traffic stop and conducted a search along the path that DOWNS took on foot as he ran from law enforcement. More specifically, law enforcement searched the grassy embankment area where DOWNS had previously ran. At approximately 6:45 p.m., law enforcement recovered a white chunky substance inside a vacuum sealed bag in a puddle along the grassy embankment where DOWNS had fled.

19. According to testing and analysis by the Drug Enforcement Administration North Central Laboratory, the substance that was recovered by law enforcement officers from the area near where DOWNS was arrested tested positive for fentanyl and weighed approximately 109.1 grams.

8

20. As the investigation continued, Individual A and DOWNS were released from law enforcement custody without charges at approximately 8:00 p.m.

21. At approximately 9:33 p.m., on April 7, 2025, PARKER, using Target Phone 1, received an intercepted phone call from DOWNS, who was using Subject Phone 3. During this call, the following conversation occurred:

PARKER: You good

DOWNS: Nope.

PARKER: What's wrong?

DOWNS: Your boys followed me all the way from the from there.

PARKER: Police?

DOWNS: Yeah, K-9s and everything.

PARKER: What happened?

DOWNS: I don't know. I gotta, made a move Unc. I ran they tased me. I'm just getting out the hospital. But you know I tossed that shit wherever I tossed it, and they obviously they didn't find it cus they let me go.

PARKER: Alright, let me talk to my man.

DOWNS: Alright.

22. Based on my training, experience, and knowledge of the investigation, I believe that during the above conversation DOWNS explained to PARKER that DOWNS had been pulled over by law enforcement after he purchased the narcotics from PARKER. DOWNS further told PARKER that DOWNS ran from law enforcement and discarded ("tossed") the narcotics that he had purchased from PARKER to avoid law enforcement detection. DOWNS also believed that law

9

enforcement did not find the narcotics because law enforcement did not keep DOWNS in custody.

23.    Based on my training and experience, the approximately 109.1 grams of fentanyl that law enforcement seized from DOWNS on April 7, 2024, is not consistent with a user quantity of fentanyl, but rather is a quantity of fentanyl that is indicative of distribution.

## II.    CONCLUSION

Based on the foregoing, I respectfully submit that there is probable cause to believe that, on or about April 7, 2024, VERNADO PARKER knowingly distributed a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1); and that RAMON DOWNS knowingly possessed with intent to distribute a controlled substance, namely, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide), a Schedule II Controlled Substance,

in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

*Michael Ganley*

MICHAEL GANLEY
Special Agent, Federal Bureau of
Investigation


SWORN TO AND AFFIRMED by telephone June 18, 2026.

Honorable ALBERT BERRY III
United States Magistrate Judge

11